IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF LOUISIANA

SHREVEPORT DIVISION

| | | |
|---|---|---|
| **TANGO TRANSPORT, LLC** | * | **CIVIL ACTION NO. 5:08-CV-0559** |
| **VERSUS** | * | **JUDGE S. MAURICE HICKS, JR.** |
| **TRANSPORT INTERNATIONAL POOL, INC.** | * | **MAGISTRATE JUDGE KAREN L. HAYES** |

### MEMORANDUM ORDER

Before the court is a motion for sanctions [doc. # 90] filed by defendant, Transport International Pool, Inc. ("TIP") complaining of conduct by plaintiff, Tango Transport, L.L.C. ("Tango") in connection with the discovery process. For reasons assigned below, the motion is denied in part, and granted in part.[1]

### Background

I. The Underlying Dispute

The facts of this case revolve around a 2004 sale and lease-back agreement (the "Agreement") in which TIP agreed to provide Tango with 384 trailers. (Original Compl., ¶ 5 [doc. # 1]).

In April 2008, Tango filed its original complaint, seeking, under the terms of the Agreement, reasonable storage fees for some of the leased trailers that allegedly had remained on Tango's premises after Tango notified TIP to take possession of them. *Id.* at ¶ 9. In addition,

---

[1] As this motion is not excepted within 28 U.S.C. § 636(b)(1)(A), nor dispositive of any claim on the merits within the meaning of Rule 72 of the Federal Rules of Civil Procedure, this order is issued under the authority thereof, and in accordance with the standing order of this court. Any appeal must be made to the district judge in accordance with Rule 72(a) and L.R. 74.1(W).

Tango sought a declaratory judgment regarding the parties' rights, liabilities, and obligations under the terms of the Agreement. *Id.* at ¶ 10.

In May 2008, TIP filed an answer and a counterclaim. In its counterclaim, TIP alleged that Tango was in default of the Agreement, and that TIP was entitled to collect for lease charges, damages to the trailers, and late fees. (Answer and Countercl., ¶ 12 [doc. #4]).

A non-exhaustive list of the issues in dispute between the two parties includes: the condition of the trailers when returned by Tango to TIP; the timing of the return of the trailers; Tango's claim that it was forced to store trailers on its premises for several months after Tango notified TIP that they were ready to be picked up; and TIP's claim that it is owed repair costs, damages, delay rentals, and late fees under the terms of the Agreement on many of the trailers. (Tango's Mot. Partial Summ. J., ¶ 14 [doc. # 109]).

II. The Discovery Dispute

The record, evidence, and testimony herein show the following: On December 8, 2008, TIP served Tango with requests for production of documents requesting Tango to produce, *inter alia*, "a copy of all writings, correspondence, electronic mail, documents . . . or other written or printed materials . . . pertaining to . . . Tango Transport's dispute with the Defendant in this case. . . ." (Produc. Docs., 5 [doc. #90, Ex. 1]).

On January 4, 2009, without having first responded to TIP's document requests, Tango replaced its computer mainframe. Lewis Hickman, Tango's Vice President of Information Systems, testified at his deposition as well as at the hearing on this motion that "non-active emails," i.e, emails that had been deleted by both sender and receiver(s), including internal emails among Tango's employees, would not have been preserved when Tango replaced its mainframe. (Hr'g; Lewis Hickman Dep., 24:18-24). However, Hickman also testified at the

2

hearing that because of the lack of space on its server, even in the absence of a replacement of Tango's mainframe, emails that had been deleted by both sender and receiver(s) would exist in Tango's database for at most three days.

On January 26, 2009, in response to TIP's document requests, Tango produced documents for inspection by TIP's attorney and one of TIP's representatives, Christina DiSanto, at its Shreveport office. Tango's production consisted of maintenance and movement records of 380 of the 384 trailers at issue, and a spreadsheet which summarized each trailer's inspection and repair history. Missing from Tango's production were any internal Tango emails about the trailers. (Mot. Sanctions, ¶ 4 [doc. # 90]). Ms. DiSanto testified that TIP repeated its requests for all of Tango's emails, including any internal emails, at the document production meeting in Shreveport.

Ralph Nelson, Tango's in-house counsel, testified that TIP notified Tango of its interest in viewing internal Tango emails at several points in February, March, and April of 2009. Nelson also testified that in December 2008, when Tango received TIP's document request, he searched his own email account for all TIP related emails and asked employees of Tango who he knew had previously worked with TIP to preserve as well as provide him with all TIP related emails they possessed in their email accounts. These Tango employees included Bobby J. Gorman, President; Ken Eggen, Vice president of Maintenance; Jim Cannon, Vice President of Maintenance; Dan Stipp, Chief Financial Officer; and La San Allien, Administrative Assistant. However, Nelson's request resulted in only three emails, none of which were internal emails. (Hr'g; Mot. Sanctions, Ex. 2 ). Moreover, Nelson did not ask the following Tango employees to preserve and provide him with all TIP related emails they possessed in their email accounts until June 2009 at the earliest: Lewis Hickman, who testified at the hearing to receiving and

3

forwarding to other Tango employees rebill notifications of repairs that had been done or needed to be done to the trailers[2]; Janice Kyker, Tango's Vice President of Operations who was responsible for knowing the location of the trailers, and Arthur Hobbs, who was responsible for recording when the trailers left and returned from Tango's premises.

On July 23, 2009, TIP filed the instant motion for sanctions. In its motion, TIP alleged that "after months and months of depositions and repeated requests for email documents from Tango employees, it has now come to light that Tango *never even asked* its employees to locate or produce email documentation *until approximately six months after* the initial request was made and the discovery period was just about to expire." (emphasis in original) (Mot. Sanctions, Introduction). As a result, TIP sought an adverse inference at the trial of this matter as a sanction for Tango's spoliation of evidence. *Id.* In addition, TIP sought monetary sanctions against Tango for preparing the instant motion, and for depositions and re-depositions that TIP claimed would have been unnecessary had TIP received the requested documents in a timely fashion. *Id.*

On August 17, 2009, Tango filed a reply brief. The brief included a timeline of email productions that Tango alleged it had submitted to TIP. (Tango's Mem. Br. 19 [doc. # 101]). The timeline indicated that Tango had made email productions to TIP on July 22, July 31, and August 10 of 2009. *Id.* at 16, 20.

The evidentiary hearing was held on September 3, 2009, and TIP filed a sur-reply brief, with attachments, on September 10, 2009 [doc. # 108]. The matter is now ripe.

**Discussion**

---

[2] Tango belonged to Premier Services, an online application that allows TIP customers to view damage and maintenance invoices on their leased trailers. Premier Service sends, via email, rebill notifications of these invoices to TIP customers.

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Consolidated Aluminum Corp. v. Alcoa, Inc.* 244 F.R.D. 335, 339 (M.D. La. 2006). "Factors in determining the appropriate sanctions for wrongful destruction of evidence include: 1) the degree of fault of the party who altered or destroyed the evidence; 2) the degree of prejudice suffered by the opposing party; and 3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party and if the fault is serious, will serve to deter such conduct by others in the future." *Toth v. Calcasieu Parish*, No. 06-998, 2009 WL 528245, at *3 (W.D. La. 2009). Ordering an adverse inference instruction at trial is a drastic remedy that courts try to avoid when lesser sanctions are available. *Consolidated Aluminum*, 244 F.R.D. at 340.

I. <u>Adverse Inference</u>

In the Fifth Circuit, a party who seeks the sanction of an adverse inference must establish that (1) the party with control over the evidence had a duty to preserve it at the time it was destroyed; (2) the evidence was destroyed in bad faith; and (3) the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense. *Consolidated Aluminum,* 244 F.R.D. at 340; *Condrey v. Sun Trust Bank of Georgia*, 431 F.3d 191, 203 (5th Cir. 2005).

(a) <u>Duty to Preserve</u>

The duty to preserve evidence "arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Toth*, 2009 WL 528245, at *2. "Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Id.* The scope of the duty to preserve

5

evidence includes employees likely to have relevant information, i.e., 'the key players' in the litigation. *Consolidated Aluminum*, 244 F.R.D. at 339.

As noted above, Tango filed this action in April of 2008. In December 2008, TIP requested all email that Tango possessed in its computer database pertaining to the underlying lawsuit between the parties. TIP repeated this request in January 2009, when the parties met at Shreveport for the initial production of documents, as well as throughout February, March, and April of 2009. After receipt of TIP's document requests in December of 2008, Tango did put a litigation hold on the email accounts of Bobby J. Gorman, President; Ken Eggen, Vice president of Maintenance; Jim Cannon, Vice President of Maintenance; Dan Stipp, Chief Financial Officer; and La San Allien, Administrative Assistant, all of whom were key players. However, Tango did not put a litigation hold on the email accounts of Lewis Hickman, Jan Kyker, and Arthur Hobbs - three Tango employees who possessed information about the TIP trailers and whom Ralph Nelson conceded were also key players for purposes of this dispute - until June 2009. Nelson testified that his failure to put a litigation hold on the accounts of Hickman, Kyker, and Hobbs was not with any intent to deprive TIP of any information; he negligently failed to realize that their accounts might contain e-mails concerning TIP. In the meantime, Hobbs deleted TIP related emails; Hickman stated that he probably deleted some TIP related emails at some time, but was not specific about when that might have occurred; Kyker denied having deleted any emails from her computer.

If Tango's duty to preserve the email of its key players for purposes of its dispute with TIP was not triggered before Tango filed its complaint in April 2008, it certainly was triggered when Tango filed the complaint, and even the most negligent of litigants could not have helped but recognize the existence of the obligation when TIP submitted its request for documents to

6

Tango in December 2008. Thus, TIP had a duty to preserve the emails of its key players, including Hickman, Kyker, and Hobbs, which it breached by failing to put a litigation hold on their email accounts.[3]

(b) Bad Faith

For the spoilater to act in "bad faith," it must act with fraudulent intent and a desire to suppress the truth. *See Consolidated Aluminum*, 244 F.R.D. at 343-44. Courts generally find evidence of "bad faith" only when the facts of the case are extreme, such as "where the destroyed evidence was the very automobile that was the subject of the products liability action." *Id.* at 344 (citing *Dillon v. Nissan Motor Co.,* 986 F.2d 263, 268 (8th Cir. 1993)).

Tango responded to TIP's initial request for documents by producing maintenance and movement records of 380 of the 384 trailers at issue and a spreadsheet which summarized each trailer's inspection and repair history. Ralph Nelson also asked the Tango employees that he knew to have previously worked with TIP, those that he thought of as key players, to provide and preserve all TIP related emails in their email accounts. However, Tango failed to put a litigation hold on the email accounts of anyone at the time suit was filed, and failed to put a litigation hold on the accounts of three key players - Hickman, Kyker, and Hobbs - until ten months after it filed

---

[3] TIP argues that Tango's replacement of its mainframe in January 2009 resulted in the permanent deletion of emails related to the underlying dispute. (TIP Reply Mem., 2-6 [doc. # 104]). TIP points to Hickman's deposition testimony that non-active emails - internal Tango emails that had been deleted by both sender and receiver(s) - were not preserved when Tango replaced its mainframe. *Id.* at 2-3. However, Hickman testified at the hearing that in the absence of a replacement of Tango's mainframe, non-active emails would exist on Tango's database for at most three days. Thus, Tango's replacement of its mainframe would have at most permanently deleted only those emails which became non-active in the three days before the mainframe was replaced. Therefore, it was Tango's failure to put a litigation hold on the email accounts of Hickman, Hobbs, and Kyker, and not the replacement of the mainframe, which had the potential to result in the permanent deletion of non-active emails.

its complaint and six months after TIP submitted its initial request for documents. While bad faith could be inferred from these facts, the likelihood that the same information is contained in other sources, such as TIP's own database, as well as the emails that Tango ultimately produced in July and August of 2009, suggests otherwise. *See Consolidated Aluminum*, 244 F.R.D. at 346. In addition, the fact that the emails TIP actually points to as being missing did not contain any unique or damaging information weighs against any deliberate destruction of them with the intent to deprive TIP of the information contained in them.

        (c) <u>Relevance</u>

Whether evidence is "relevant" for purposes of the adverse inference analysis depends upon "(1) whether the evidence is relevant to the lawsuit; (2) whether the evidence would have supported the inference sought; and (3) whether the non-destroying party has suffered prejudice from the destruction of the evidence." *Id.* Thus, a party seeking an adverse inference must demonstrate, through extrinsic evidence, that the destroyed evidence would have supported the proposed inference. *Id.*

TIP has not carried its burden of proof on this point. In its brief, TIP notes that certain rebill notification emails sent to Lewis Hickman through Premier Services were absent from Tango's July and August 2009 document production. (TIP Reply Mem., 4). Since Hickman, who did not recall receiving these emails, testified that they were of a type that he would have forwarded to other Tango employees (Dep. Lewis Hickman), TIP claims that their absence from Tango's document production indicates that "there is at least one category of documents [that is] clearly lost . . . ." (TIP Reply Mem., 4). However, in the same paragraph that TIP makes this assertion, TIP notes that it retrieved these same emails from its own database. *Id.* The undersigned fails to see how Tango's breach of the duty to preserve prejudiced TIP, for purposes

of the adverse inference analysis, when the only emails that TIP can definitively point to as having been lost are currently in TIP's possession. More importantly, the emails that TIP suggested at the hearing as having been lost are dated between January and February of 2008, well before Tango filed suit, and almost a year before TIP's document requests were served. (Tango's Sur-Reply, 3 [doc. # 108]).

At the hearing, TIP argued that while Tango's loss of TIP's emails to Tango regarding re-bills might not be prejudicial, loss of internal emails among Tango's employees regarding the handling of the rebills might well be. Thus, TIP essentially argued that the court should draw from the alleged absence of these emails the inference that the emails would have supported TIP's position that it is entitled to repair costs for the trailers under the terms of the Agreement even if the repairs were never actually made. However, TIP has not provided the court with any evidence, either direct or circumstantial, that the allegedly destroyed emails would have supported TIP's proposed inference. TIP's argument is therefore too speculative to merit adverse inference instructions.

Furthermore, TIP's proposed inference is premature. Under basic contract principles, a court will not admit parole evidence unless the party seeking to introduce the parole evidence demonstrates that the underlying agreement between the parties is ambiguous. Since TIP has not demonstrated that the Agreement is ambiguous, it has not laid a foundation for the admission of any evidence beyond the language of the contract itself. If parole evidence is inadmissible, then an inference arising from such evidence would also be inadmissible.

As a final matter, the undersigned notes that if TIP's contention that it is entitled to recover for both the cost of repairs and the diminution in the value of its trailers, regardless of whether the repairs were actually made, is a correct interpretation of the agreement between the

parties, then if that remedy is not contained in the express language of the contract, and if the contract is ambiguous, it seems likely that other evidence, such as custom in the industry or prior course of dealing between the parties or with other companies operating under the same contract, would be needed to support such a contention. Thus, the parole evidence that TIP seeks may well be available from other sources, and there has simply been no showing that it is not.

II. Monetary Sanctions

When a court rejects an adverse inference, it may still impose monetary sanctions for spoliation and other discovery misconduct. *Phoenix Four, Inc. v. Strategic Resources Corp.*, No. 05 CIV. 4837, 2006 U.S. Dist. LEXIS 32211, at *7 (S.D.N.Y. May 22, 2006); *Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 77 (S.D.N.Y. 1991). "Like an adverse inference, an award of costs serves both punitive and remedial purposes: it deters spoliation and compensates the opposing party for the additional costs incurred." *Turner*, 142 F.R.D. at 77; *see Toth*, 2009 WL 528245, at *1 (setting forth deterrence of further discovery abuses as one of the goals of discovery sanctions). When evidence has been destroyed, monetary sanctions are particularly appropriate when a court has no way of knowing what, if any, value the destroyed evidence has to the movant's case. *United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 21, 26 (D.D.C. 2004). Monetary sanctions are also appropriate when a party is prejudiced by the late production of documents. *Phoenix Four, Inc.,* No. 05 CIV 4837 at *7 (monetary sanctions appropriate to reimburse the re-depositions of certain witnesses caused by the late production of documents and to serve the deterrent function of discovery sanctions) ; *Ferrero v. Henderson*, 341 F. Supp. 2d 873, 904 (S.D. Ohio, 2004) (monetary sanctions appropriate where a party's late production of evidence resulted in the preparation of a FMLA claim by opposing counsel in the absence of "crucial evidence") .

TIP makes two arguments as to monetary sanctions. First, TIP contends that it is entitled to collect the deposition costs of four specific Tango employees - Darryl Gorman, Elizabeth Cannon, Ivan Buckner, and Bridgette Hopkins - that TIP claims it "blindly" took because of Tango's inadequate responses to its document requests, as well as attorney's fees for preparation and travel expenses associated with these depositions. (Hr'g, Ex. 12, 1, 4; TIP Reply Mem., 9). Second, TIP contends that it is entitled to collect attorney's fees for the costs associated with the instant motion for sanctions. (Hr'g, Ex. 12, 1, 6-8).

TIP's first argument is unconvincing. TIP traveled to Shreveport in June 2008 to take the depositions of several Tango employees besides Gorman, Cannon, Buckner, and Hopkins, (Tango's Sur-Reply, 3), and thus it is not entitled to collect travel expenses associated with this trip. TIP is also not entitled to collect the deposition costs of any of these four employees. As to Gorman and Cannon, TIP deposed them based on the belief that they had signed personal guarantees to the Agreement. TIP did not have a copy of a signed guarantee in its possession, but still chose to depose Gorman and Cannon, apparently in hopes of eliciting admissions from them. There has simply been no showing that any late-produced documents would have convinced TIP that it did not need to depose either of them. As to Buckner and Hopkins, both of them were heavily involved in the Tango-TIP relationship - Buckner, as Vice President of Safety, ensured that the trailers met federal and state standards, and Hopkins, as Controller of Tango, supervised the initial document production in January 2009 and was identified by Tango as a witness it would call at trial - and TIP has given no plausible reasons why it would not have deposed them if Tango had provided an adequate and timely response to the document requests.

However, to the extent that TIP finds it necessary to re-depose any witness due to the dilatory production of documents, it will be entitled to recover attorney's fees and costs

11

associated with any re-depositions of Tango employees made necessary because of new information contained in Tango's late production. *See Phoenix Four, Inc.*, No. 05 CIV 4837 at *7.

TIP is also entitled to recover reasonable attorney's fees associated with the instant motion for sanctions. Tango's dilatory responses to TIP's repeated requests for internal emails and failure to institute a litigation hold on its documents which, if nothing else, surely would have speeded up the production of same, have prejudiced TIP's ability to complete discovery in a timely fashion. Tango did not provide TIP with a substantial production of internal emails until July 22, 2009 - three weeks after the June 30, 2009 discovery deadline. (Scheduling Order, 3 [doc. #63]). TIP would not have had to prepare and file a motion to compel (Mot. Compel [doc. # 78]) or prepare and present evidence on the instant motion had Tango been more readily forthcoming with its discovery responses and imposed a litigation hold on all key players at the beginning of this litigation. Furthermore, awarding TIP reasonable attorney's fees associated with the instant motion will serve to deter Tango from committing similar discovery abuses in future litigation. *See Toth*, 2009 WL 528245, at *1.

### III. Calculation of Attorney's Fees for the Instant Motion

"The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Blum v. Stenson*, 465 U.S. 886, 888 (1984), *quoted in Blanchard v. Bergeron*, 489 U.S. 87, 94 . The product of this calculation is commonly referred to as the "lodestar" amount. *See e.g.*, *Blanchard*, 489 U.S. at 95; *Farrar v. Hobby*, 506 U.S. 103, 118 (1992).

The lodestar amount "is more than a mere 'rough guess' or initial approximation of the final award to [be] made." *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S.

546, 565 (1986) (quoting *Blum*, 465 U.S. at 898-900). "A strong presumption that the lodestar figure . . . represents a 'reasonable fee' is wholly consistent with the rationale behind the usual fee-shifting statute." *Id.* After computing the lodestar amount, the court must determine whether it should be adjusted in light of the twelve factors set forth in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717-19 (5th Cir. 1974).[4]

(a) <u>Determination of the Lodestar</u>

TIP submitted an itemized report which provided that TIP's counsel incurred $13,100 in attorney's fees for preparing the instant motion. This amount is based on 65.5 hours of work collectively billed by four different attorneys, each at an hourly rate of $200.[5]

(1) <u>Reasonable Hourly Rate</u>

The first step for this court in calculating the lodestar amount is to determine the

---

[4] The 12 *Johnson* factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to properly perform the legal services; (4) the preclusion of other employment by the attorney due to acceptance of this case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and results obtained; (9) the experience, reputation, and ability of counsel; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. 488 F.2d at 717-19.

[5]

| **Original Request for Attorneys' Fees and Costs** | | |
|---|---|---:|
| Susan C. Mangold | 45 hrs. at $200/hr | $9,000 |
| Mary Ellen Allen | 14 hrs. at $200/hr. | $2,800 |
| Maureen M. McBride | 3.5 hrs. at $200/hr. | $700 |
| Joel Frank | 3 hrs. at $200/hr. | $600 |
| TOTAL | | $13,100 |

13

appropriate hourly rate to be used in the calculation. *Alberti v. Klevenhagen*, 896 F.2d 927, 930 (5th Cir. 1990), *vacated in part*, 903 F.2d 352 (5th Cir. 1990). "Hourly rates are to be computed according to the prevailing market rates in the relevant legal market." *Hopwood v. Texas*, 236 F.3d 256, 281 (5th Cir. 2000). The relevant legal market is the community where the district court sits. *Tollett v. City of Kemah*, 285 F.3d 357, 368 (5th Cir. 2002). A reasonable hourly rate for a particular community can be established by reference to rates awarded in prior cases. *Entm't Software Ass'n v. Foti*, No. 06-431, 2007 U.S. Dist. LEXIS 46381, at *10 (W.D.La. Apr. 10, 2007).

In this case, TIP charged the same hourly rate of $200 for four different attorneys. While TIP has not provided the court with the qualifications or experience of any of these attorneys, the undersigned is aware that three of these attorneys are partners - Ms. Mangold, Ms. McBride and Mr. Frank - and that Ms. Allen is an associate. Lamb McErlane, PC, http://www.chescolaw.com/lawyers/lawyers.html (last visited Oct. 5, 2009).

In the undersigned's experience, the $200 hourly rate is reasonable for the three partners but not for the associate. Ms. Allen's hourly rate will therefore be reduced to $150 in the final calculation of attorney's fees.

(2) <u>Number of Hours Reasonably Expended</u>

The second step in calculating the lodestar amount requires this court to determine the number of hours reasonably expended. *See Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). The party requesting fees has the burden of establishing this number. *Id.* at 437. The court may reduce the award if the documentation of hours is inadequate or if the hours are "excessive, redundant, or otherwise unnecessary." *Id.* at 433-34. A prevailing party may receive attorneys' fees for an unsuccessful claim as well, but only if that claim involves facts or related legal

14

theories in common with the successful claims. *Id.* at 434.

The itemized report that TIP submitted indicates that TIP's counsel expended 65.5 hours in preparing the instant motion. The undersigned has reviewed this report and finds that while each of the individual entries on the itemized report are, for the most part, reasonable, the bill as a whole fails to demonstrate any exercise of billing judgment.

To meet its burden of showing that the number of hours billed was reasonable, TIP must also prove that counsel exercised billing judgment. *Saizan v. Delta Concrete Prods. Co.*, 448 F.3d 795, 799 (5th Cir. 2006). "Billing judgment requires documentation of the hours charged and of the hours written off as unproductive, excessive, or redundant." *Id.*; *see also Abner v. Kansas City Southern Railway Co.*, No. 03-CV-0765, 2007 U.S. Dist. LEXIS 45222, at *5-6 (E.D. La. June 21, 2007) ("conclusory assertions [that counsel exercised judgment] do not constitute billing judgment."). "The proper remedy for omitting evidence of billing judgment . . . [is] a reduction of the award by a percentage intended to substitute for the exercise of billing judgment." *Id.* Since TIP has not provided any showing that its counsel exercised billing judgment, the undersigned will reduce the total award by ten percent as a substitute therefor.

On the other hand, the undersigned also finds that two entries must be added to the itemized report for the report to completely document the fees incurred by TIP. First, the three hours that TIP's counsel expended in presenting the instant motion before this court must be added. Second, the reasonable travel expenses that TIP's counsel as well as one of TIP's employees incurred in traveling to Monroe for the instant motion, which the undersigned estimates to be $650 per person, must also be added to the award.

After taking into account the ten percent reduction, as well as the reduction of Ms.

15

Allen's hourly rate and the aforementioned additions to the total hours expended and total fees incurred by TIP's counsel, the lodestar amount equals $12,870.[6]

(b) Reasonableness of the Lodestar Amount

The court now applies the remaining *Johnson* factors to determine if the lodestar amount should be adjusted. The court may not double count any *Johnson* factor taken into account in calculating the lodestar amount. *Shipes v. Trinity Indus.*, 987 F.2d 311, 320 (5th Cir. 1993). Seven of the *Johnson* factors are presumably fully reflected in the lodestar amount: (i) the time and labor required; (ii) the novelty and difficulty of the questions; (iii) the preclusion of other employment; (iv) special time limits imposed; (v) the results obtained; (vi) the experience, reputation, and ability of counsel; and (vii) the quality of representation. *Del. Valley Citizens' Council for Clean Air*, 478 U.S. at 565; *Walker v. U.S. Dep't of Hous. and Urban Dev.*, 99 F.3d 761, 771-72 (5th Cir. 1996); *Shipes*, 987 F.2d at 321-22.

The record in this case does not support an adjustment of the lodestar amount based on

---

[6]

| Adjusted Total Lodestar Amount | | |
|---|---|---|
| Susan C. Mangold | 48 hrs. at $200/hr. | $9,600 |
| Mary Ellen Allen | 14 hrs. at $150/hr. | $2,100 |
| Maureen M. McBride | 3.5 hrs. at $200/hr. | $700 |
| Joel Frank | 3 hrs. at $200/hr. | $600 |
| Travel Expenses | | $1,300 |
| Pre-10% Reduction TOTAL | | $14,300 |
| 10% Reduction | | $(1,430) |
| TOTAL | | $12,870 |

the remaining *Johnson* factors. For example, there is no evidence that the case is particularly undesirable. Nor is there any indication that the professional relationship between plaintiff and counsel merits an adjustment.

For the aforementioned reasons TIP is hereby awarded **$12,870.00** in attorneys' fees and costs as a sanction for its failure to institute a litigation hold or to fully respond to TIP's discovery requests in a timely fashion. **The above amount is to be paid by Tango to TIP within 30 days of the date of this order**. In addition, should TIP need to re-depose any witness because of information contained in the late-produced documents, Tango is to bear the cost of the supplemental deposition. Finally, should TIP need additional time to file any motion or to respond to any pending motion, or should it need to re-open discovery, it is to file a motion setting out what additional discovery it needs to conduct, and how much additional time is needed to file any motion or to respond to any pending motion.

Thus done and signed, in Chambers, this 7th day of October, 2009.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE