**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**SHREVEPORT DIVISION**

TANGO TRANSPORT, LLC                    CIVIL ACTION NO. 08-559

VERSUS                                  JUDGE S. MAURICE HICKS, JR.

TRANSPORT INTERNATIONAL                 MAGISTRATE JUDGE HORNSBY
POOL, L.L.C.

<u>**MEMORANDUM RULING**</u>

        This action was initiated when Tango Transport, L.L.C. ("Tango") filed a Complaint
against Transport International Pool, Inc. ("TIP") seeking a judgment declaring the parties'
rights, liabilities and obligations under two lease agreements and the addendums thereto
and asserting a claim in quantum meruit to recover reasonable storage charges for the
lease trailers at issue.  [Record Document 1].  In response, TIP asserted a counterclaim
against Tango and a third-party, Gorman Group, Inc., for breach of the lease agreements
and breach of guaranty.  [Record Document 4].  Thereafter, Robert Gorman and B.J.
Gorman were named as additional Plaintiffs and Counter-Defendants, and Tango asserted
a claim against TIP for wrongful sequestration of 81 dry van trailers.  [Record Documents
56, 62].

        A bench trial in this matter commenced on Monday, June 14, 2010.  Tango withdrew
its wrongful sequestration claim for recovery of return costs incurred after the writ of
sequestration but reserved the right to pursue the wrongful sequestration claim for
purposes of recovering attorneys' fees.  After hearing the testimony and having carefully
examined the documentary evidence presented by both parties during trial, the Court
adopts the stipulations of the parties and makes the following findings of facts and
conclusions of law:

**STIPULATIONS**

1.      Tango Transport, L.L.C. ("Tango") is a Texas Limited Liability Company with its
        principal place of business in the State of Louisiana.  The member of Tango
        Transport, L.L.C. is Gorman Group, Inc., which is a Texas corporation with its
        principal place of business in the State of Louisiana.  Gorman Group, Inc. does not
        have a principal place of business in the State of Pennsylvania.  [Record Document
        191, Stipulation 1].

2.      Bobby Jack Gorman is an individual and a citizen of the State of Texas.  [Record
        Document 191, Stipulation 2].

3.      Robert Gorman is an individual and a citizen of the State of Louisiana.  [Record Document 191, Stipulation 3].

4.      Transport International Pool, Inc. ("TIP") is a Pennsylvania corporation with its principal place of business in the State of Pennsylvania.  TIP does not have a principal place of business in the State of Texas and does not have a principal place of business in the State of Louisiana.  [Record Document 191, Stipulation 4].

5.      The Vehicle Lease Agreement provides the "Agreement and the parties' rights and obligations hereunder shall be governed by the laws of the Commonwealth of Pennsylvania."  [Record Document 191, Stipulation 5].

6.      In January/February 2004, Tango and TIP entered into a sale and lease-back involving 125 dry van trailers whereby TIP purchased those trailers from Tango, and Tango executed a lease agreement with TIP for Tango's continued use of those 125 trailers in Tango's business operations.  [Record Document 191, Stipulation 6].

7.      The total purchase price paid by TIP to Tango for the 125 trailers was the sum of $1,295,000.00.  [Record Document 191, Stipulation 7].

8.      The purchase price was allocated as $10,000.00 per trailer for 57 1998 Trailmobile trailers (i.e., $570,000.00); $10,750 per trailer for 60 1999 Great Dane trailers (i.e., $645,000.00); and $10,000.00 per trailer for eight 1998 Great Dane trailers (i.e., $80,000.00).  [Record Document 191, Stipulation 8].

9.      The lease-back portion of the parties' agreement was accomplished by the parties' execution of Vehicle Lease Agreement No.1-BN1E6 ("VLA"), Maintenance Addendum M/N–1, Schedule AB–1 and Schedule AB–2 which were executed by Tango on January 29, 2004.  [Record Document 191, Stipulation 9].

10.     The lease term for the trailers listed on Schedules AB–1 and AB–2 was for 36 months, with an expiration date of February 28, 2007.  [Record Document 191, Stipulation 10].

11.     On February 6, 2004, Gorman Group, Inc. executed a Guaranty agreement in favor of TIP.  [Record Document 191, Stipulation 11].

12.     On February 11, 2004, Tango executed an "Additional Terms Addendum A/T" which became part of the parties' VLA.  [Record Document 191, Stipulation 12].

13.     On February 11, 2004, Tango also executed a Corporate Resolution authorizing the sale of the trailers listed in Schedule AB–1 and Schedule AB–2.  The resolution was then delivered to TIP.  [Record Document 191, Stipulation 13].

14.     The "Return Location" for the 125 trailers listed on Schedules AB–1 and AB–2 was TIP's facility in Little Rock, Arkansas.  [Record Document 191, Stipulation 14].

15.     TIP's facility in Little Rock, Arkansas, was closed and not available as a "Return Location" for several months prior to as well as at the time of the expiration of the 36-month lease term for the first group of 125 trailers.  [Record Document 191, Stipulation 15].

16.     In July 2004, Tango and TIP entered into a similar sale and lease-back agreement whereby TIP purchased a second group of 259 trailers from Tango, and subsequently leased those 259 trailers back to Tango for use in Tango's business operations as a motor carrier.  [Record Document 191, Stipulation 16].

17.     The total purchase price paid by TIP to Tango for the 259 trailers was the sum of $3,108,000.00.  [Record Document 191, Stipulation 17].

18.     The purchase price was allocated as $12,000.00 per trailer for 259 1999 Great Dane trailers.  [Record Document 191, Stipulation 18].

19.     The lease-back portion of the parties' agreement was accomplished by the execution of an additional Schedule AB–1–18J9M describing the second group of 259 trailers, and the execution of another "Additional Terms Addendum A/T" which references its application to the second group of 259 "Vehicles listed on Schedule AB–1–I8J9M."  [Record Document 191, Stipulation 19].

20.     Schedules AB–1–I8J9M and the "Additional Terms Addendum A/T" became part of the original VLA as reflected on the face of the referenced Schedules.  [Record Document 191, Stipulation 20].

21.     The second group of 259 lease trailers had a return location at the end of the lease term of 101 Corporate Dr., Sibley, Louisiana, a location requested by Tango. [Record Document 191, Stipulation 21].

22.     On July 22, 2004, Tango also executed a Corporate Resolution authorizing the sale of the trailers listed in Schedule AB–1–I8J9M.  [Record Document 191, Stipulation 22].

23.     On August 10, 2004, Bobby J. Gorman executed a Guaranty agreement in favor of TIP.  [Record Document 191, Stipulation 23].

24.     In May 2006, Tango and TIP entered into a Terminal Rental Adjustment Addendum to VLA Schedule No. 1-8S7S4 for the lease to Tango by TIP of 81 2004 dry van trailers ("TRAC Lease").  [Record Document 191, Stipulation 24].

25.     The last rental payment paid by Tango for the rental amounts due on the 125 trailers listed on Schedule AB–1 and Schedule AB– 2 to the parties' VLA was the sum of $28,364.96 paid in March 2007, for the rental period of February 1, 2007 through February 28, 2007.  [Record Document 191, Stipulation 25].

26.     Tango did not pay any rental amounts on the 125 trailers listed on Schedule AB–1 and AB–2 for any period after the rental period of February 1, 2007 through February 28, 2007.  [Record Document 191, Stipulation 26].

27.     Although the term of the lease for the second group of 259 trailers was for 36 months and expired at the end of July 2007, the last rental payment paid by Tango with respect to the 259 trailers listed on Schedule AB–1–I8J9M was made in September 2007 in the amount of $68,894.00 for the rental period of August 1, 2007 through August 31, 2007.  [Record Document 191, Stipulation 27].

28.     Tango did not pay for any rental amounts on the 259 trailers listed on Schedule AB–1–I8J9M to the parties' VLA for any period after the rental period of August 1, 2007 through August 31, 2007.  [Record Document 191, Stipulation 28].

29.     TIP had a valid Vehicle Title for each of the 81 2004 dry van trailers which were the subject of the TRAC Lease at all times relevant to this action.  [Record Document 191, Stipulation 29].

30.     The term of the TRAC Lease was 39 months.  [Record Document 191, Stipulation 30].

31.     In May 2008, Tango was current on all lease payments for the trailers which were the subject of the TRAC Lease.  [Record Document 191, Stipulation 31].

32.     TIP's claim for the alleged property damage to the 384 trailers which were the subject of the parties' VLA, Schedules AB–1, AB– 2, and AB–1–I8J9M, was dismissed by the Court's Memorandum Order rendered on November 11, 2009, the Court's Memorandum Order rendered on December 21, 2009, the Memorandum Order rendered by U.S. Magistrate Judge Karen L. Hayes on January 25, 2010, and the Order rendered by this Court on February 10, 2010.  [Record Document 191, Stipulation 32].

## FINDINGS OF FACT

1.     The VLA provides in Section 21, under the heading "Vehicle Return", "[u]pon termination of this Agreement in any manner permitted hereunder, or upon the return of any Vehicle, Lessee shall deliver said Vehicle to Lessor at the Return Location set forth on Schedule AB."  [Ex. 001-005].

2.     The designated "Return Location" for the 125 lease trailers listed on Schedules AB–1 and AB–2—TIP's facility in Little Rock, Arkansas—was closed for several months prior to and at the time of the expiration of the 36-month lease term, rendering it impossible for Tango to comply with the "Vehicle Return" requirement in Section 21 of the VLA as it pertained to return location.

3.     In November 2006, approximately three months prior to the termination of the lease term for the 125 lease trailers, Tango and TIP began ongoing discussions and negotiations regarding the return location for the 125 lease trailers as well as the timing of the return of these lease trailers.  [Testimony of Phil Raleigh and Dan Stipp].

4.       The majority of discussions and negotiations between the parties were conducted through Dan Stipp, Tango's CFO, and Phil Raleigh, TIP's National Account Manager responsible for Tango's account.  Id.  Phil Raleigh was the primary TIP employee, or the "account owner", responsible for facilitating all sales and operations agreements with Tango.  See Testimony of Phil Raleigh ("I was the relationship with the customer."); Testimony of Mike Tillery ("Phil Raleigh was the account owner."); Exhibit 991-12.

5.       During these discussions, TIP allowed Tango an additional thirty (30) days, or until March 28, 2007, to return the first group of 125 lease trailers.  [Testimony of Phil Raleigh and Dan Stipp; Exhibit 991-4].

6.       Tango initially requested they be allowed to return the 125 lease trailers to TIP's Dallas location and proposed the 125 lease trailers and 259 lease trailers be commingled. [Ex. 13].  Specifically, on November 16, 2006, Dan Stipp sent an email to Phil Raleigh with the following proposal:

> What we would like to do, if mutually agreed upon, is deliver the first 125 or so to your Dallas location. . .  We can possibly deliver quite a few more possibly [sic] to your Indianapolis or Memphis location in the months to come. . .
>
> * * *
>
> . . . So, in doing the above mentioned, we would like to consider both groups of trailers during this whole process.  What that will do, with respect to the two separate leases, is show some trailers possibly turning in early and some possibly late, dependent of which lease they fall under.
>
> In doing this we can/will continue to make full scheduled payments through March on the 125 and July on the 259. . .

[Ex. 013-001, -002].

7.       However, on November 28, 2006, Dan Stipp communicated to Phil Raleigh that Tango's plans had changed and the Dallas location would not be an acceptable return location.  At no time did Tango and TIP ever reach an agreement or have a "meeting of the minds" to designate TIP's Dallas facility as the return location for the 125 lease trailers.  [Testimony of Dan Stipp; Exhibits 14, 990].

8.     On February 7, 2007, as discussions continued, Tango requested the 125 lease trailers be brought to Tango's Sibley, Louisiana location for retrieval by TIP.  In return, Tango would deliver some of the 259 lease trailers to TIP's facilities in Indianapolis, Indiana and West Memphis, Arkansas.  [Testimony of Dan Stipp; Exhibit 15].  This proposal would be a substantial savings to TIP since, under the terms of the VLA, TIP was responsible for retrieving the group of 259 lease trailers from Tango's Sibley location.

9.     Around this same time period, Tango was considering the purchase of 500 new trailers to replace the trailers being returned to TIP in 2007.  [Testimony of Phil Raleigh, Dan Stipp and Jim Cannon].

10.    TIP wanted to continue its business relationship with Tango and began preparing proposals for the providing of or funding of the new trailers by TIP.  [Testimony of Phil Raleigh and Dan Stipp; Exhibits 19, 1000, 1001].

11.    As encouragement for Tango to consider TIP's proposals, Phil Raleigh represented to Tango that TIP would agree to the first 125 lease trailers being brought to Tango's Sibley location for retrieval by TIP.  [Testimony of Dan Stipp; Exhibits 18-20].

12.    On February 28, 2007, Phil Raleigh had a face-to-face meeting with Dan Stipp and Tango's President, BJ Gorman, to discuss the issue of the trailer lease returns. [Testimony of Phil Raleigh and Dan Stipp].  During that meeting, Phil Raleigh confirmed that Tango could bring the first group of 125 lease trailers to the Sibley location for retrieval by TIP at TIP's expense.  See Exhibit 023-001 (internal TIP email in which Phil Raleigh indicates the 125 lease trailers are being "used to leverage other deals").

13.    In addition, Phil Raleigh confirmed that Tango would be allowed to commingle the first group of 125 lease trailers and the second group of 259 lease trailers without regard to lease end dates, and that TIP would not bill Tango on any of the 125 lease trailers after March 2007.  See Testimony of Dan Stipp and Mike Tillery; Exhibit 026-001 (email from Phil Raleigh to Dan Stipp regarding lease billing end dates); Exhibit 039-002 (internal TIP email in which Phil Raleigh informs his team members that "[o]ne of the stipulations of the returns was the fact that since there are 2 groups (125 and 259) and these trailers are the same, it makes sense to pull out assets from each expiring group–some early since the 259 expire in Aug 07 and some late since the 125 expired in Feb 07."); Exhibit 047-001 (internal TIP email in which Phil Raleigh tells John Benoit: "Make sure that you communicate with Kim our agreement that relative to the 2 groups of SLB units . . . That is some are turned in

early while others are turned in a little past the lease end.  Feb 07 group payment has ended and all of Aug expirations will be paid until then REGARDLESS of whether they have been turned in or not.").

14.     Tango was assured that any billings by TIP for rentals on the 125 lease trailers after February 2007 would be corrected in accordance with the parties' agreement.  See Exhibit 051-001 (TIP Dispute Representative emails Phil Raleigh requesting unit numbers that should have been terminated in February 2007 so that credits may be issued).

15.     In accordance with the agreement made by Phil Raleigh on behalf of TIP, Dan Stipp told Ken Eggen, Tango's Vice President of Fleet Maintenance, to bring in lease trailers to the Sibley location, to have those trailers de-identified, and to perform any repairs necessary to bring the lease trailers up to trade terms as required by the VLA and the addendums thereto.  [Testimony of Dan Stipp and Ken Eggen].

16.     The actions taken by Tango in bringing in the lease trailers to Tango's Sibley location as opposed to making arrangements to have them delivered to a TIP facility were done in reliance upon the representations and agreements made by Phil Raleigh on behalf of TIP.  [Testimony of Dan Stipp].

17.     At no time in March 2007, or anytime thereafter, did TIP provide Tango any oral or written notice that it was in default of the VLA by failing to deliver 125 lease trailers to TIP at a TIP facility.  In fact, at no time did TIP ever inquire of Tango as to why 125 lease trailers were being parked at Tango's Sibley location rather then being brought to one of TIP's facilities.  [Testimony of Phil Raleigh and Dan Stipp and their email correspondence].  Rather, approximately one week after the February 28, 2007 meeting, Phil Raleigh informed Dan Stipp that the first group of 125 lease trailers to be returned had been sold to a third party buyer and that the buyer would "begin picking up the trailers next week."  [Exhibit 027-001; see also Exhibit 028-001; Exhibit 029-001].

18.     TIP's sale of the lease trailers to the third party buyer, Jackson Truck and Trailer, a/k/a MCH Transportation (hereinafter "MCH"), was an "as is, where is" "FOB Sibley, Louisiana" sale.  [Testimony of Mike Tillery; Exhibit 025-003; Exhibit 030-001; Exhibit 048-001].  The terms of the sale of the lease trailers to MCH were communicated to Tango. [Testimony of Dan Stipp and Ken Eggen; Exhibit 027-001 ("In an effort to move fast, we have sold all these assets...").

19.   TIP's internal correspondence indicates an "as is, where is" sale to MCH was the most fiscally responsible decision because TIP would otherwise incur substantial FOE ("fleet operating expense") expenses. [Testimony of Mike Tillery]. In fact, John Benoit sent an email to his supervisors stating:

> As I mentioned, the 1998's have been sold for $7,500 and the 1999's have been sold for $8,000. This is a $700 profit per unit or $87,000 for the deal. As I mentioned previously, the original deal was a [sic] approved to have the units terminate @ the Sibley, LA Tango facility and our company was responsible to move the units back to our facilities at our cost between $1,100 to $1,250 to move the units to the border [sic] towns. This could have been a worst cast [sic] FOE exposure of $150,000.

[Exhibit 030-002].

20.   Further internal TIP correspondence confirms that "selling these units where they currently sit is the correct and fiscally responsible decision. The region/company was staring down a barrel of a $125,000 FOE hit that now is down to $0." [Exhibit 030-001]. TIP's internal correspondence also confirms that, because the sale is "as is", inspections of the lease trailers at Tango facilities could be waived because such inspections would "only prolong the process" and increase expenses. Id.; see also Exhibit 065-002 (internal TIP email wherein Mike Tillery indicates the sale to MCH benefits Tango because it would otherwise be Tango's "responsibility to repair them to TFS specs and that would cost him a fortune, if we have to put them in the fleet.").

21.   Additional emails between Phil Raleigh and Tango employees in March 2007 confirm TIP represented to Tango that the 125 lease trailers had been sold and that the buyer would immediately begin picking up the lease trailers from Tango's Sibley location. [Exhibits 28, 31, 32, and 35].

22.   Despite TIP's representations to Tango, Mike Tillery testified MCH merely signed a letter of intent ("LOI") to purchase 125 trailers; MCH never signed a formal sales contract agreeing to purchase 125 lease trailers. [Testimony of Mike Tillery]. In fact, MCH expressly retained "the right to inspect and reject any trailer, as necessary due to condition, prior to acceptance." [Exhibit 025-002]. Moreover, Mike Tillery testified that MCH's right to inspect and accept or reject trailers was not limited to the first group of 125 lease trailers but applied to all 384 trailers leased by Tango. [Testimony of Mike Tillery].

23.     On March 6, 2007, Phil Raleigh requested Mike Tillery refrain from tendering an LOI for the remainder 259 lease trailers because the return location of those units could be "used to leverage other deals."  [Exhibit 023-001].

24.     On March 9, 2007, Tango provided TIP written notice that Tango had at least 25 lease trailers "ready" for pick-up by TIP's buyer.  [Exhibit 028-001].  "Ready" for pick up meant Tango had de-identified the lease trailers, that the lease trailers met all DOT requirements, and that the lease trailers met trade terms.  [Testimony of Ken Eggen; Exhibit 1056-1].

25.     On March 29, 2007, Tango provided TIP written notice that 43 lease trailers were ready for pick-up by TIP's buyer.  [Exhibit 37].

26.     Despite Phil Raleigh's March 9, 2007 promise that TIP's buyer would "begin picking up the trailers next week," none of the lease trailers had been picked by TIP's buyer by the end of March.  Rather, on March 29, 2007, Phil Raleigh informed Ken Eggen that the buyer had secured a lot near Sibley and again assured Tango that the buyer "should begin moving trailers next week."  [Exhibit 035-001].

27.     On April 18, 2007, Tango provided TIP written notice that Tango had 58 of the lease trailers ready for pick-up by TIP's buyer.  [Exhibit 42].  At that time, MCH had picked up only two of the lease trailers from Tango's Sibley location.  Id.

28.     When Dan Stipp informed Phil Raleigh that only two of the lease trailers had been picked up, Phil Raleigh responded: "I will dial up the heat with our buyer today."  Id.

29.     By the end of April 2007, Tango had 122 lease trailers parked at its Sibley location.  [Exhibit 109].  By this time, the failure of either TIP or MCH to pick up trailers from Tango's Sibley location began to interfere with Tango's business operations.  [Testimony of Dan Stipp and Ken Eggen].

30.     Rather than MCH picking up lease trailers from Tango's Sibley location, MCH was bringing potential customers to Tango's Sibley location to "cherry-pick" trailers (i.e. choose trailers that were already in retail condition) and essentially used Tango's Sibley location as a sales lot or storage lot.  [Testimony of Phil Raleigh, Mike Tillery, Dan Stipp and Ken Eggen; Exhibit 1100-1].

31.   As MCH visited Tango's Sibley location, MCH would make requests to TIP for Tango to perform additional repairs to the trailers.  [Testimony of Phil Raleigh and Ken Eggen].  Although Tango disputed that it was their responsibility to make such repairs, Tango complied with many of the repair requests in an attempt to facilitate the movement of the lease trailers away from the Sibley location.  [Testimony of Ken Eggen].

32.   Many of the repairs requested by MCH were "above and beyond" those needed to bring the lease trailers up to "trade terms."  [Testimony of Ken Eggen; Exhibit 1021].

33.   Around this time, TIP learned the retrieval of lease trailers from Tango and the sale of some of those lease trailers to MCH would not be profitable; in fact, TIP learned they could potentially lose $1000 per unit.  [Record Document 48].

34.   As of May 18, 2007, only 21 lease trailers had been removed from Tango's Sibley location.  [Exhibits 52, 109].  At that time, Tango informed TIP that "60 plus" were ready for pickup.  Tango also indicated that it was trying to make the requested repairs to another 35-40 of the lease trailers but that they were "jammed up." [Exhibit 052-001].

35.   At the end of May 2007, Tango began moving some of the lease trailers to its West Memphis, Arkansas location.  [Testimony of Dan Stipp and Ken Eggen; Exhibit 059-001].  As of May 28, 2007, 134 lease trailers remained parked at Tango's Sibley location and eight lease trailers had been parked at its West Memphis location. [Exhibits 109, 110, 112].

36.   On June 14, 2007, Dan Stipp emailed Phil Raleigh a list of trailers that were ready to be picked up at the Sibley and West Memphis locations and informed him that MCH's failure to pick up the trailers was affecting their ability to bring in more trailers.  [Exhibit 059-001].  Dan Stipp also inquired as to whether Tango could utilize TIP's facilities to drop off the lease trailers.  [Testimony of Dan Stipp; Exhibit 61].

37.   On that same date, Phil Raleigh informed Dan Stipp he had "a sale for all remaining units."  [Exhibit 060-001].  Nevertheless, the lease trailers continued to remain parked at Tango's facilities.  [Testimony of Dan Stipp].

38.   In mid-June 2007, MCH requested Tango move some of the lease trailers to a nearby lot (also referred to as "Nolen's").  [Testimony of Dan Stipp and Ken Eggen;

Exhibit 65].  Tango complied with MCH's request and moved 19 lease trailers to the nearby lot.  [Exhibit 109].

39.  In early July 2007, Tango again attempted to make arrangements for delivery of the lease trailers to TIP's facility in Memphis.  [Exhibits 68, 69, 74].  Dan Stipp repeatedly expressed his frustration to Phil Raleigh that MCH was not picking up the trailers it had purchased.  [Exhibits 64, 68].

40.  TIP's internal correspondence demonstrates Phil Raleigh's representations and assurances to Tango about the sale of lease trailers to MCH were false. Specifically, as of June 25, 2007, although TIP had obtained a letter of intent to sell the first group of 125 lease trailers, "the sale [had] gone much slower than expected" and only 40 of 125 had actually been sold.  [Exhibit 066-001].  Furthermore, TIP's internal correspondence demonstrates a LOI had *not* been obtained by MCH or any other third-party buyer for the remaining 259 leases.  See, supra, FOF #24, 38; Exhibit 023-001.

41.  The problems with MCH failing to pick up the lease trailers from Tango's locations continued through July 2007.  By the end of July 2007, MCH had only taken possession of 43 of the 125 trailers which TIP represented had been sold, including the 19 trailers Tango had moved to Nolen's.  [Exhibit 109].

42.  As of July 30, 2007, 163 lease trailers remained parked at Tango's Sibley location and 59 lease trailers remained parked at its West Memphis yard.  Id.

43.  On August 7, 2007, Tango provided TIP with some leads for available space in Memphis and Shreveport and indicated that Tango was in a "holding pattern" until some of the lease trailers could be removed from Tango's Sibley and West Memphis locations.   [Testimony of Dan Stipp; Exhibit 090-002].

44.  The failure of TIP and MCH to remove the lease trailers from Tango's facilities precluded Tango from bringing any additional lease trailers to Tango's Sibley location as the Sibley yard already had trailers parked two and three rows deep. [Testimony of Dan Stipp, Ken Eggen, Jim Cannon; Exhibit 1100-1].

45.  TIP argues the failure of MCH to remove the lease trailers was the result of the lease trailers not being repaired to "trade terms" as defined in TIP's "playbook."  See Exhibit 991.

46.   TIP's "playbook" is a relatively standardized internal TIP document that has the capability of being modified for each customer.  See Exhibit 991.  The "Operations Playbook" created for Tango was emailed to Dan Stipp on November 29, 2007, approximately three months before the expiration of the first group of 125 lease trailers.  Id.

47.   The "playbook" on which TIP relies for the return condition of the lease trailers was not signed by Tango and there is no evidence that Tango agreed to the conditions set forth in the "playbook."  Id.

48.   Peter Roy (TIP employee) inspected many of the lease trailers in May 2007 and reported the following:

>    General: Good condition.  Panels good, rails good, de-id excellent, interior plyliners were in perfect condition...

[Exhibit 055-001].

49.   TIP argues there was some degree of deflection on many of the lease trailers and that this deflection did not satisfy "trade terms."  However, TIP admits there was an industry-wide problem with the cross members of 1998 and 1999 Great Dane trailers (which made up a large percentage of the 384 lease trailers at issue) and that MCH was aware of these problems prior to signing the LOI.  [Testimony of Phil Raleigh and Mike Tillery; Exhibit 055-002, -003].

50.   TIP's employees admitted they only used TIP's internal "playbook" or "TICARS" when inspecting trailers and that several provisions set forth in the "TICARS" required a higher standard than "trade terms."  [Testimony of Mike Tillery and Jason Holman].  While the deflection of the cross members may not have satisfied TIP's "TICARS" or the "Return Conditions" set forth in the "playbook," TIP failed to present any evidence indicating the deflection of the cross members fell below industry standards or "trade terms" or otherwise rendered the lease trailers unsafe or unusable.

51.   In addition, contrary to TIP's argument that Tango's delay in making repairs was the cause of the delay in retrieving the lease trailers from Tango's Sibley location, the results of TIP's inspections of 47 trailers were not shared with Tango until mid-July 2007 and TIP did not make arrangements for additional inspectors to go to Tango's Sibley location until August and September of 2007.  [Exhibits 75, 91 and 96].

52.   TIP also argues the failure to retrieve lease trailer's from Tango's Sibley location was the fact that Tango was continuing to utilize TIP's lease trailers in its business operations.  See Testimony of Christina DiSanto; Exhibit 595.  Once again, TIP failed to present any evidence[1] demonstrating Tango was intentionally utilizing TIP's lease trailers in its business operations across the United States after the expiration of the lease agreement.  See Exhibit 595.

53.   In mid-August 2007, TIP secured a location in Jackson, Mississippi at which Tango could drop-off the lease trailers.  [Exhibit 093-002, -003; Exhibit 1056-1].

54.   By the end of August 2007, Tango had delivered six of the lease trailers to the Jackson facility and 52 of the lease trailers to TIP's Memphis facility.  [Exhibit 109].

55.   TIP picked up 21 lease trailers from Tango's Sibley location in September 2007 and 44 lease trailers in October 2007.  [Exhibit 109].  By January 21, 2008, 154 lease trailers had been picked up from Tango's Sibley location by TIP, 30 by MCH, and 12 by Nolen's; 36 lease trailers were also picked up from Tango's West Memphis location by TIP, resulting in TIP or TIP's agents picking up 232 lease trailers from Tango's locations.  Id.

56.   Excluding the trailers sold to MCH, TIP billed Tango for delay rentals until the lease trailers arrived at a TIP facility, irrespective of the return locations provided in the VLA or the agreement made by the parties in February 2007 and irrespective of whether the lease trailers were brought up to "trade terms."  [Exhibit 595; Deposition of John Benoit].

57.   TIP's invoices for delay rentals are not consistent with Section 21 of the VLA or the agreement reached by the parties in February 2007.  [Exhibit 001-005; Exhibit 1042-1].

58.   TIP did not comply with its agreement to retrieve the first 125 lease trailers from Tango's Sibley location.

---

[1]The Court notes that throughout this litigation TIP has made numerous arguments and asserted various theories about the failure of the lease trailers to be returned in a timely manner.  Nevertheless, TIP's arguments are not substantiated by the evidence.  Mere speculation on the part of TIP's lawyers and/or TIP's employees is not sufficient to hold Tango liable for breach of the lease agreement.

59.    TIP's failure to retrieve the lease trailers in a timely manner prevented Tango from bringing in additional lease trailers and perform necessary repairs in a timely fashion.

60.    The reasonable value of Tango's services in providing storage for the TIP lease trailers on Tango's yards is the sum of $150.00 per month per trailer.  [Testimony of Dan Stipp].

61.    On May 14, 2008, after receiving Tango's Complaint seeking a declaratory judgment, TIP sought sequestration of the 81 TRAC lease trailers.  TIP's stated basis for obtaining the sequestration was that Tango was in default and material breach of the parties' contract because Tango owed TIP the sum of $526,113.47 in lease charges and damages, together with $38,946.77 in late fees.   [Record Document 4].

62.    Over the course of the 36-month lease term on the 125 lease trailers, Tango paid to TIP lease payments in the total amount of $1,110,549.99.  [Exhibit 107-001].

63.    Over the course of the 36-month lease term on the 259 lease trailers, Tango paid to TIP lease payments in the total amount of $2,729,241.19.  [Exhibit 108-001].

64.    Tango's obligations under the VLA were originally secured by a Letter of Credit, which TIP released in June 2007 on the basis of good customer performance. [Testimony of Phil Raleigh].

65.    As of the date TIP sought a writ of sequestration from the Court and caused the U.S. Marshal to sequester the 81 TRAC lease trailers, Tango:

a.    Had paid in full to TIP the entire $1,110,549,99 owed for the original 36-month lease term on the 125 lease trailers;

b.    Had paid in full to TIP the entire $2,729,241.19 owed for the original 360month lease term on the 259 lease trailers;

c.    Had returned to TIP all of the 384 lease trailers (with the exception of four trailers which Tango had bought and paid for); and

d.    Was up to date on all of its lease payments for the 81 TRAC lease trailers.

66.   By letter dated March 13, 2008, TIP, by and through counsel Susan C. Mangold, demanded payment from Tango of $596,292.58 by March 27, 2008, which included: (1) alleged past-due lease payments and damages in the amount of $468,958.07; (2) alleged late fees in the amount of $37,334.51, and (3) alleged additional damages of $67,000.  [Exhibit 104].

67.   Of the $535,958.07 in lease charges and damages demanded by TIP, the Court has already held that, based on the clear and unequivocal language of the VLA, Tango is not liable to TIP for any alleged property damage to the trailers.  <u>See</u> Record Document 143.

68.   The action of TIP in causing the Magistrate Judge to issue a writ of sequestration for the 81 TRAC lease trailers which Tango was utilizing throughout the United States in its trucking operations caused Tango to incur at least $1,250.00 per trailer in increased operational costs, as Tango was forced to retrieve those trailers and return them to a storage facility in Louisiana.

## CONCLUSIONS OF LAW

### A.   <u>Law of Agency</u>

1.   Under Pennsylvania law, an agency association typically provides the agent with either actual or apparent authority to act on behalf of the principal.  <u>See</u> <u>Volunteer Fire Co. v. Hilltop Oil Co.</u>, 412 Pa.Super 140, 206 A.2d 1348, 1351-52 (Pa.Super.Ct. 1992).  The party asserting agency must prove its existence by a preponderance of the evidence.  <u>Scott v. Purcell</u>, 490 Pa. 109, 415 A.2d 56, 60 n.8 (Pa. 1980).

2.   Actual agency exists where there is a "(1) manifestation by the principal that the agent shall act for him; (2) the acceptance of the undertaking by the agent; and (3) the control of the endeavor in the hands of the principal."  <u>Tribune Review Publ'g Co. v. Westmoreland County Hous. Auth.</u>, 574 Pa. 661, 833 A.2d 112, 119-20 (Pa. 2003).

3.   Apparent authority exists when the principal, "*by words or conduct*, leads people with whom the alleged agent deals to believe that the principal has granted the agent authority he or she purports to exercise."  <u>Turner Hydraulics, Inc. v.</u>

Susquehanna Const. Corp., 414 Pa.Super. 130, 606 A.2d 532, 534 (Pa.Super.Ct. 1992) (citation omitted; emphasis in original).

4.   For all purposes relevant to this litigation, Phil Raleigh was an agent of TIP and had apparent authority to act on TIP's behalf.  See Testimony of Phil Raleigh ("I was the relationship with the customer."); Testimony of Mike Tillery ("Phil Raleigh was the account owner.").

**B.   Breach of Contract**

1.   To establish a claim for breach of contract under Pennsylvania law,[2] the plaintiff must establish: (1) the existence of a contract, including its essential terms; (2) a breach of duty imposed by the contract; and (3) resultant damage.  Nesselrotte v. Allegheny Energy, Inc., 615 F.Supp.2d 397, 407 (W.D.Pa. 2009); Church v. Tentarelli, 953 A.2d 804, 808 (Pa.Super. 2008).[3]

2.   The proper interpretation of a contract is a question of law to be determined by the Court.  Standard Venetian Blind Co. v. American Empire, Ins. Co., 503 Pa. 300, 304, 469 A.2d 563, 566 (Pa. 1983).  When interpreting a contract, the Court's goal is to determine the intent of the parties as manifested by the language of the written instrument and to give effect to all provisions in the contract.  Id., 503 Pa. at 305, 469 A.2d at 566; Com., Dept. of Transp. v. Manor Mines, Inc., 523 Pa. 112, 119, 565 A.2d 428, 432 (Pa. 1989).

3.   The fundamental rule in interpreting the terms of a written instrument is to ascertain and give effect to the intent of the contracting parties.  Murphy v. Duquesne Univ. of the Holy Ghost, 565 Pa. 571, 590-91, 777 A.2d 418, 429 (2001).

---

[2]See infra, Stipulation 5 ("The Vehicle Lease Agreement provides the "Agreement and the parties' rights and obligations hereunder shall be governed by the laws of the Commonwealth of Pennsylvania.").

[3]Although Pennsylvania law imposes a duty of good faith and fair dealing on each party in the performance of contracts, there is no separate cause of action for breach of these duties under Pennsylvania law.  In other words, "a claim arising from a breach of the covenant of good faith must be prosecuted as a breach of contract claim, as the covenant does nothing more than imply certain obligations into the contract itself." Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91 (3d Cir. 2000).

4.      Under Pennsylvania law, "contracts are enforceable when parties reach mutual agreement, exchange consideration and have set forth terms of their bargain with sufficient clarity." Biddle v. Johnsonbaugh, 444 Pa.Super 450, 458, 664 A.2d 159, 163 (1995).  Once a contract has been formed, it may be modified only if both parties consent to the modification and the modification is founded upon valid consideration. Corson v. Corson's, Inc., 290 Pa.Super 528, 532, 434 A.2d 1269, 1271 (Pa.Super. 1981), citing Wilcox v. Register, 417 Pa. 475, 207 A.2d 817 (1965).

5.      Performance of a contract is excused when it is prevented by the acts of the other party or is rendered impossible by him. Philadelphia Television Network, Inc. v. Reading Broadcasting, Inc., 2005 WL 1668346, *23 (Pa.Com.Pl. 2005).

6.      Section 21 of the VLA states, in pertinent part:

    21.    VEHICLE RETURN.  Lessee shall return each Vehicle to Lessor in good condition, normal wear and tear excepted, with tires and brakes in accordance with Section 4 hereof or any maintenance addendum executed in connection herewith, and all Lessee identification, logos and decals, together with any residue therefrom, removed to Lessor's satisfaction.  Upon termination of this Agreement in any manner permitted hereunder, or upon the return of any Vehicle, Lessee shall deliver said Vehicle to Lessor at the Return Location set forth on Schedule AB.  In the event Lessee returns any Vehicle to any other location, Lessee shall pay all costs incurred by Lessor in returning said Vehicle to the Return Location.  Any Vehicle not returned in good operating condition and otherwise as set forth herein shall remain leased hereunder until the required repairs are completed by Lessee in a manner acceptable to Lessor, Lessee pays Lessor the actual or estimated cost of repair or Lessee purchases the Vehicle in accordance herewith.

    [Exhibit 001-005].

7.      TIP's Little Rock Distribution Center, identified as the "Return Location" on Schedules AB–1 and AB–2 to the VLA, was closed for several months prior to the February 28, 2007 termination date of the 125 lease trailers, making it impossible for Tango to return the first group of 125 lease trailers to TIP at the agreed upon "Return Location" contained in the parties' VLA.  See Exhibit 001-010, -016. Consequently, Tango was excused from its obligation to return the first group of 125 lease trailers to TIP at the Little Rock Distribution Center prior to the February 28, 2007 termination date.

8.      TIP claims the remaining provisions of the VLA and the addendums thereto remained in effect and that Tango breached its duties under the agreement by failing to bring the lease trailers up to lease terms and failing to pay delay rentals. Tango essentially contends, however, that the representations and agreements made by TIP in February 2007, and the subsequent actions taken by both parties thereafter, estops TIP from denying the existence of the February 2007 agreement and precludes TIP from enforcing the provisions of the VLA and the addendums thereto insofar as those provisions relate to the return of the lease trailers.

9.      It is well-established under Pennsylvania law that provisions of a written agreement may be waived or modified by the parties' course of conduct.  See Velocity Intern., Inc. v. Celerity Healthcare Solutions, Inc., 2009 WL 1616522, *5 (W.D.Pa. 2009); First Nat'l Bank v. Lincoln Nat'l Life Ins. Co., 824 F.2d 277, 280 (3d Cir. 1987) (a provision of a written contract may be waived or modified by the conduct of the parties where there is "clear, precise and convincing evidence" that the parties intended to waive or modify that provision); Trustees of First Presbyterian Church v. Oliver Tyrone Corp., 72 Pa. D. & C.2d 410, 1974 WL 15945 (1974) (an agreement to rescind or modify a contract "may be inferred from the attendant circumstances and conduct of the parties"); Barr v. Deiter, 190 Pa.Super. 454, 154 A.2d 290, 292 (1959) ("Parties to a written contract may abandon, modify or change it either by words or conduct.").

10.     In Atlantic Richfield Co. v. Razumic, 480 Pa. 366, 376, 390 A.2d 736, 741 (Pa. 1978), the Pennsylvania Supreme Court recognized that the parties' conduct is often "the strongest indication of what the writing means."   Id. (citing Restatement (Second) of Contracts § 228, Comment (g)) ("the parties to an agreement know best what they meant, and their action under it is often the strongest evidence of their meaning").

11.     Thus, under Pennsylvania law, "[a] contract must be interpreted in light of the meaning which the parties have accorded to it as evidenced by their conduct in its performance."  Capital Bus Co. v. Blue Bird Coach Lines, Inc., 478 F.2d 556, 560 (3d Cir. 1973); see also, Philips Elec. & Pharm. Indus. Corp. v. Leavens, 421 F.2d 39, 45 (3d Cir. 1970) ("A well recognized principle of contract law requires that the terms of a contract be interpreted in light of the meaning which the parties themselves have attached to them as evidenced by their subsequent conduct."); Am. Cyanamid Co. v. Ellis-Foster Co., 298 F.2d 244, 246 (3d Cir. 1962) ("what the parties do under a contract is highly important in determining the meaning of the agreement which they have made").

12.  Beginning in November 2006,[4] when TIP learned of Tango's desire to purchase 500 new trailers, TIP disregarded the terms of the VLA and the Addendums thereto *in their entirety* in an attempt to gain and/or continue its business relationship with Tango.  Specifically, TIP disregarded the terms of the VLA and the Addendums thereto in hopes of securing a potentially lucrative business arrangement of furnishing or providing funding for the 500 new trailers to be acquired by Tango.

13.  By the time the lease term on the 125 lease trailers expired, the terms of the VLA and the Addendum thereto were no longer capable of meeting the objectives contemplated by either party at the time of execution.

14.  Tango and TIP's course of conduct demonstrates that all terms of the VLA and Addendums relating to the return of the lease trailers were abrogated.  See e.g., Parking Auth. of the City of Wilkes-Barre v. Ten East South St. Co., 78 A.2d 1096, 1101 (Pa.Cmwlth. 2001) (finding Ten East's conduct demonstrated it had abandoned the option to contract for certain parking spaces).

15.  Furthermore, TIP's actions in disregarding the terms of the VLA and the Addendums thereto preclude TIP from enforcing those terms insofar as those terms relate to the return of the lease trailers.[5]  See Commonwealth of Pennsylvania, et al. v. King Crown Corp., et al., 52 Pa.Cmwlth. 156, 162, 415 A.2d 927, 930 (1980).

16.  In February 2007, having abrogated the original terms of the VLA and the Addendum thereto with respect to the return of the lease trailers, TIP and Tango verbally agreed to the following modifications:

a.  Tango could commingle the first group of 125 lease trailers and the second group of 259 lease trailers during the return;

b.  TIP would retrieve the first group of 125 lease trailers from Tango's Sibley location;

---

[4]From that point forward, all of TIP's actions and words were financially motivated.

[5]For purposes of this litigation, the Court notes that the only terms at issue relate to the return of the lease trailers—*i.e.*, return date, return location, condition of the trailers, amount of rental payments, etc.

    c.      Tango would deliver a large portion of the second group of 259 lease trailers to TIP's facilities;

    d.      Tango would return some of the first 125 lease trailers after the March 28, 2007 deadline and some of the second 259 lease trailers before the July 31, 2007 deadline (i.e. some "early" and some "late");

    e.      The entire group of 384 trailers were to be returned to TIP (or retrieved by TIP) by July 31, 2007;

    f.      Tango would not be responsible for any lease payments on the 125 lease trailers after February 28, 2007; and

    g.      Tango would be responsible for delay rentals for any lease trailers not returned to TIP by July 31, 2007.

17.     In addition, as a result of the Letter of Intent signed by MCH to purchase 125 lease trailers, TIP agreed to forego the inspections of these lease trailers.

18.     TIP failed to comply with its agreement to retrieve the first 125 lease trailers from Tango's Sibley location.

19.     TIP failed to timely make other facilities available for TIP to return any of the lease trailers.

20.     TIP breached the February 2007 agreement by billing Tango for lease payments on the first group of 125 lease trailers after February 28, 2007.  Tango is not responsible for any lease payments on the first group of 125 lease trailers as listed on Schedule AB–1 and Schedule AB–2 of the VLA.

21.     TIP's failure to timely retrieve the first group of 125 lease trailers and to make other facilities available for Tango to drop-off lease trailers rendered Tango's obligation to timely de-identify, repair and return the remaining 259 lease trailers impossible, thereby excusing Tango from its obligation to return the second group of 259 lease trailers by July 31, 2007.  Consequently, Tango is not responsible for any delay rentals on the second group of 259 lease trailers.

**C.**     **Breach of Guaranty**

1.      The Gorman Group, Inc., and Bobby Gorman are not liable to TIP for any monies on their guaranties executed in favor of TIP in this matter since Tango was not in material default for failure to pay delay rentals.

2.      Robert E. Gorman is not liable to TIP in this matter as he has not executed a guaranty in favor of TIP at any time.

### D.      Quantum Meruit

1.      Under Louisiana law,[6] "*quantum meruit*" is an equitable remedy "founded upon the principle that no one who benefits from labor . . . of another should be unjustly enriched at the other's expense.  The doctrine operates, in the absence of a specific contract, to infer a promise on behalf of the person to whom the benefit is conferred to pay a reasonable sum for the services or materials furnished." Kane Enterprises v. MacGregor (USA) Inc., 322 F.3d 371, 375 (5th Cir. 2003) (quoting Brankline v. Capuano, 656 So.2d 1, 5 (La.App. 3 Cir. 1995)).  "In other words, *quantum meruit* presupposes both the absence of an express contract and unjust enrichment of the defendant." Id.

2.      TIP claims the remaining provisions of the VLA and the addendums thereto remained in effect and that Tango breached its duties under the agreement by failing to bring the lease trailers up to lease terms and failing to pay delay rentals. Tango essentially contends, however, that the representations and agreements made by TIP in February 2007, and the subsequent actions taken by both parties thereafter, estops TIP from denying the existence of the February 2007 agreement and precludes TIP from enforcing the provisions of the VLA and the addendums thereto insofar as those provisions relate to the return of the lease trailers.

------

[6]Pursuant to the terms of the VLA, Pennsylvania law governed the contractual rights and obligations of the parties.  [Exhibit 001].  Because the terms of the VLA pertaining to the return of the lease trailers were abrogated and the other provisions of the VLA had been fulfilled, the choice-of-law provision no longer applies and the parties may pursue equitable remedies under Louisiana law.  See La. C.C. art. 3515; Dorsey v. Northern Life Ins. Co., 2005 WL 2036738, at *6 (E.D.La. 2005) (where choice-of-law provision provided that the terms of the Agreement were "governed by the laws of the State of Louisiana," district court held that Washington law applied to contract claims and Louisiana law applied to tort and statutory claims arising out of the contractual relationship).

3.    In order to establish unjust enrichment, a plaintiff must prove: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and impoverishment, (4) an absence of justification or cause for the enrichment or impoverishment, and (5) no other remedy at law.  <u>SMP Sales Management, Inc. v. Fleet Credit Corp.</u>, 960 F.2d 557, 559-60 (5th Cir. 1992) (citing <u>Edmonton v. A-Second Mortgage Co.</u>, 289 So.2d 116, 120 (La. 1974)).

4.    Alternatively, Louisiana courts have held that "[w]hen a contract is implied from the circumstances. . ., but no agreement as to compensation has been reached, the missing term is supplied by the court, and the measure of damages, under what has been termed *quantum meruit*, is the reasonable value of the claimant's services." <u>Dumas & Assoc., Inc. v. Lewis Enterprises Inc.</u>, 704 So.2d 433, 438 (La.App. 2 Cir. 1997).

5.    With respect to Tango's *quantum meruit* claim, the Court finds that the evidence demonstrates (1) an enrichment was bestowed upon TIP by the utilization of Tango's facilities for storage, (2) an impoverishment was suffered by Tango by that same conduct of TIP; (3) there was a connection between the enrichment and impoverishment, (4) there was an absence of justification or cause for the enrichment and impoverishment, and (5) there is no other remedy available at law to compensate Tango for these damages.  Specifically, the Court finds TIP utilized Tango's facilities as a storage yard while TIP negotiated a sale of the lease trailers to MCH and made proposals to Tango for the furnishing of or funding of 500 new trailers because TIP did not want to incur additional FOE expenses.

6.    The Court finds the value of the enrichment to TIP and the amount to which Tango is entitled to recover from TIP is the sum of $150,000.00.[7]  This amount is equivalent to $150.00 per trailer (for each of the 125 lease trailers that were to be picked up by TIP) per month beginning April 2007 through the end of November 2007.[8]  This amount is also justified by TIP's internal correspondence which indicate, in part:

---

[7]This amount could have possibly been off-set as a result of Tango's alleged use of the lease trailers in its business operations after the expiration of the lease agreement.  However, as the Court has already noted, TIP failed to present *any* evidence that Tango was intentionally utilizing TIP's lease trailers in its business operations after the expiration of the lease agreement.  <u>See</u>, <u>infra</u>, FOF #52 and n.1.

[8]According to Tango's records, TIP and/or MCH had retrieved 125 lease trailers from Tango's facilities by early December 2007.  <u>See</u> Exhibit 109.

As I mentioned, the 1998's have been sold for $7,500 and the 1999's have been sold for $8,000.  This is a $700 profit per unit or $87,000 for the deal.  As I mentioned previously, the original deal was a [sic] approved to have the units terminate at the Sibley, LA Tango facility and our company was responsible to move the units back to our facilities at our cost between $1,100 to $1,250 to move the units to the boarder towns.  This could have been a worst cast [sic] FOE exposure of $150,000.

[Exhibit 030-002].

### E.   Wrongful Sequestration

1.   Louisiana Code of Civil Procedure provides the grounds for obtaining a writ of sequestration:

> When one claims the ownership or right to possession of property, or a mortgage, security interest, lien, or privilege thereon, he may have the property seized under a writ of sequestration, if it is within the power of the defendant to conceal, dispose of, or waste the property or the revenues therefrom, or remove the property from the parish, during the pendency of the action.

2.   A writ of sequestration is an extremely harsh remedy that can only be maintained when formalities of law have been strictly complied with by the party seeking the writ.  See Burton v. Jardell, 589 So.2d 610 (La.App. 2 Cir. 1991).

3.   A court may allow damages, including attorney's fees, for the wrongful issuance of a writ of sequestration on a motion to dissolve or on a reconventional demand.[9]  Id. The proof to substantiate a claim of damages must be "clear and definite and not subject to conjecture."  Holliman v. Griffis, 415 So.2d 306, 308 (La.App. 2 Cir. 1982), writ denied, 420 So.2d 456 (La. 1982).

4.   TIP's fundamental obligation under the TRAC Lease was to provide Tango with undisturbed possession and use of the trailers so long as Tango paid TIP the designated lease payments for the primary terms set forth in the TRAC Lease.

---

[9]The Louisiana Article permitting damages for wrongful issuance of a writ of sequestration does not require that a party own the property before he is entitled to damages. Id., 732 So. 2d at 670.

5.      Under the terms of the TRAC Lease, TIP was obliged to provide Tango with possession of, and Tango had the right to possess,  81 lease trailers for 39 months.

6.      TIP's actions in obtaining a writ of sequestration from the Court and causing the U.S. Marshal to sequester the 81 lease trailers effectively breached TIP's fundamental obligation under the TRAC Lease.

7.      By the time TIP motioned the Court to sequester the 81 trailers, TIP already had in its possession the 384 trailers and Tango was timely making lease payments on the 81 trailers.  TIP's unilateral termination of its fundamental obligation under the TRAC Lease (i.e., providing Tango undisturbed possession and use of the 81 trailers for the remainder of the primary term) was a violation of TIP's duty to perform in good faith and based on fair dealings.

8.      TIP had no justifiable factual basis to reasonably expect that it had been, or would be, deprived of any part of Tango's obligation to pay lease payments for the original terms of the lease agreements.  In fact, Tango's obligations under the VLA had been secured by a Letter of Credit, which had been previously released by TIP for good customer performance.

9.      At the time of sequestration, this dispute had already been submitted to the Court for resolution.  In presenting its claims to the Court, Tango had agreed to cure its alleged failure to pay TIP for delay rentals, etc., upon a determination by this Court of the amounts owed by Tango to TIP, if any.[10] There is no evidence that TIP reasonably believed that it could not have received adequate compensation from Tango for its claims in connection with this lawsuit.

---

[10]Tango did not materially breach its obligations under the VLA by questioning TIP's claims for damages, delay rentals and late fees and filing a complaint for a declaratory judgment with this Court. See Dixie Trucks, Inc. v. Davis, 530 So.2d 107, 110 (La. App. 2d Cir.1988) (finding truck owner whose truck was sequestered for an amount due for repairs was entitled to damages for premature and wrongful sequestration when owner, at the time sequestration was sought, had raised "meritorious defenses" to amounts repair shop claimed were owed).

10. Consequently, the Court finds TIP had no reasonable basis to seek sequestration of the 81 TRAC lease trailers; rather, the Court finds that the sequestration was mere pretext for exercising economic leverage over Tango.

11. Therefore, TIP's sequestration of the 81 TRAC lease trailers was "wrongful" and Tango is entitled to recover reasonable and necessary attorneys' fees incurred in connection with the dissolution of the writ.  La. Code Civ. P. Art. 3506.

12. The amount of attorneys fees Tango has incurred in seeking the dissolution of the writ of sequestration is a matter that will be referred to the Magistrate Judge for determination pursuant to Fed. R. Civ. P. 54(d).

## CONCLUSION

Accordingly,

**IT IS ORDERED** that Tango's request for a declaratory judgment in its favor be and is hereby **GRANTED.**  Tango is not liable to TIP for the payment of $596,292.58 demanded by TIP for delay rentals, property damages to the lease trailers, late fees, interest and attorneys fees.

**IT IS FURTHER ORDERED** that, under the doctrine of *quantum meruit*, Tango be and is hereby awarded reasonable storage fees in the amount of $150,000.00.

**IT IS FURTHER ORDERED** that Tango be and is hereby entitled to recover attorneys' fees incurred as a result of TIP's wrongful sequestration of the 81 TRAC lease trailers.  This matter is **referred** to the Magistrate Judge for determination of the amount of attorneys' fees reasonably and necessarily incurred by Tango.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, on this 22nd day of December, 2010.

S. MAURICE HICKS, JR.
UNITED STATES DISTRICT JUDGE